On behalf of the appellate, Mr. Gary Mungerson. On behalf of the appellate, Mr. Sharon Debring. Mr. Munger? Mungerson. Good morning. May it please the court. We ask that this court recognize that this dispute for what it is, which is a breach of contract dispute, or more precisely, a breach of a release agreement. Trial court found a want of consideration for the separation agreement that was entered into by the parties. We believe that the case law and the record as pled in the complaint clearly show that as a matter of law, the trial court was incorrect and that there is in fact consideration for the agreement entered into by both parties. What was that? I'm sorry? Go ahead. What was that consideration? The consideration, Your Honor, was that under the facts, under the 2002 agreement entered into by the parties, Mr. Graver agreed that for a period of two years, he would not compete with the company and he would not start a competing business with the company. In 2005, and to be clear, those prohibitions were on Mr. Graver only in two instances. If he were terminated for cause or if he resigned his employment. The company was not free to terminate Mr. Graver for any reason and then attempt to enforce those covenants. So you gave up those covenants in the separation agreement? In 2005, Mr. Graver wanted to start his own company and he negotiated with with counsel representing him a better price, which is a good law firm. He negotiated that the company would agree to release him from the prohibitions that would prohibit him from competing with the company and starting up a competing business. In exchange, Mr. Graver said that he would pay the company a certain amount of money. It equaled out to being one. Well, when you say release, normally a release means it's gone forever. So was this a conditional release? Well, the conditional release was that he not breach what he promised him. I see. So all they really promised wasn't to give up any rights. It was to voluntarily suspend the enforcement thereof. As long as he did not breach any other covenants in there. But Your Honor, that's I believe that that's valid consideration given to him. It's not illusory. They could not initiate any kind of basically they have the right under the 2002 agreement to file a lawsuit to prohibit him from competing. They basically said you can't start up a competing company and we will not. We will not sue you. Is there any authority for your case citation that indicates that the mere non enforcement of a right is consideration? I believe that Tower Investors is is very much on point in that situation. There was a promissory note that was due. And under that case, the plaintiff said, if you pay us, basically there was a third party that promised to pay. And they stated, as long as you pay us, we will not enforce this promissory note. And the other party refused. And the court said that was ample consideration. That was consideration for the promises for the contract. In this situation. So did they did they prosecute the promissory note or did they prosecute the agreement? I believe they prosecuted the agreement. But in this case, Mr. Graber was given in addition to the restrictive permits, he was given the right to solicit certain customers and permitted clients while he was still working for the company. So he was given. So in addition to the non-competition agreement, the release from the non-competition provisions, he was also given the right to solicit and service a group of customers even while he was employed by the company, basically allowing him to start the road running with his new company. In exchange, Mr. Graber stated that he would that he would pay 25% of his revenues from these permitted clients, not all of his clients, just this group of permitted clients for a for a four year period, paying 25% of the revenues over that period of time. After one year, Mr. Graber asked him and Atlantic Trust agreed to extend those payments out for another two years. The amount of the payments didn't go up in some, they were just spread out. So he paid 25% in year one and then 15% or it was supposed to be 15% out for years two through five, whereas before it was 25% for years one through four. There's no question that Atlantic Trust complied with the agreement. They did not initiate any litigation. They basically abided by their promises. And for two years, Mr. Graber abided by his. Not coincidentally, upon the two year anniversary, which in fact was the date upon which the restricted covenants expired, Mr. Graber breached the agreement. He refused to make any further payments. When the company contacted him about this, he basically alleged that the non-competition provisions in the basically in the original agreement were not enforceable. But the fact is that we don't know. Did the 2000, I'll refer to it as 2005-2006 agreement provide that? If the defendant breached that agreement, 2005-2006, that you had the right to go back and reinstate and enforce the 2002 agreement. Is that correct? That is correct under the terms of the agreement, but it did not include a tolling provision, Your Honor. My question was, because the two years had passed, there was really, the 2000 agreement had no basis for enforcement. Would that be correct? The 2002 agreement? 2002, because the 2000 period had passed. With regard to the non-competition provisions, there are additional confidentiality provisions contained, non-disclosure confidentiality information that do not expire under terms under that 2002 agreement. But my point is you could not enforce the two year part of the agreement under which he could not compete. Correct. That is correct. That is what we negotiated that said we won't, we'll allow you to compete. We won't mitigate over this if you agree to this. Your Honor, if you understand me, as part of the 2005-2006 agreement, that agreement provided that. If the defendant breached that agreement, then you had the right to go back and enforce various parts of the 2002 agreement. Is that correct? That is correct, but what we waived was the right to initiate any litigation with regard to the enforcement of that agreement. If we sought to enforce that agreement, it would be because of an activity taken by Mr. Graber. We waived the right to initiate litigation. We basically said, look, unless you do this, we're not going to sue you. You are free to compete against us, even though it's in violation of the 2002 agreement. That is what the waiver and the release was. I'll ask another question. When the defendant breached, so to speak, the 2005-2006 agreement by discontinued payment, did you have the right to go back and initiate your rights under the 2000, initiate a lawsuit to enforce your rights under the 2002 agreement? That's a question of law. I would propose that because of the lack of a tolling provision within that 2000 agreement, I believe we would have an uphill battle to attempt to do this. I'm just saying whether you could file a lawsuit to try to enforce that right. It's the defendant's position that those provisions, because they were based on the time the restricted period ran from the date of termination, which would have been June 2005, that as of June 2007, those restrictive covenants had expired. We would no longer have a right to enforce those. The point is that you were able to initiate a suit on the 2002 agreement. There was nothing that said you couldn't. Now, regardless of the term had run, but if there had been a breach of the 2005 agreement, you retained the ability to bring an action under the 2002 agreement, even though you're now saying the term had told so, no. I don't believe that we under no circumstances. I believe it says that we could reinstate the terms, but the terms would have expired by 2007. So I do not believe that we did have. We would have had the right to reinstate. Sections would be sections 1A1 and 1A3 of the non-competition agreement. I believe that those, because of the language of the agreements, we no longer had the right to seek to enforce those after June, after the end of June 2007. And that period of time when they expired was at or about the time that the defendant stopped making his payments? The first payment that he missed was due immediately was the first payment that was due after the agreements had expired. And so I do contend that the consideration that. The Mister Graber received was the right to not have to worry about us initiating any sort of litigation over 1A1 and 1A3. We had that was what we gave up. That was the release of our client. What was the trial court's rationale for why it did it? It's unclear from the record. There is no transcript of the proceedings. I wasn't present. He just basically initiated the lack of a want of a want of consideration. It's our intention, without knowing what was in the trial court's mind, that there was a belief that the merits of the case that the I believe that the court misconstrued the nature of the underlying the non-competition agreement and found that it was unenforceable. And therefore, the waiver of unenforceable claims was was not valid consideration. It didn't even amount to a peppercorn. That is the argument. And basically, the arguments that were proposed by defendants were that he agreed under the under the 2002 agreement not to solicit his existing clients, the ones that he brought in. I believe that's not accurate as to what the nature of the non-competition agreement was. And so there was, I believe, a good faith basis that the trust could enforce the non-competition agreement. Mr. Graver was paid a quarter of a million dollars a year. He was given equity in the company. He was given a number of resources. So in 2005, Mr. Graver, if he believed that the non-competition agreements were unenforceable, he had, and this is to paraphrase the court in Sunbelt Rentals, he could have not, he could have chosen not to abide by that. He could have basically said, look, I don't think it's enforceable. You sue me, or you could have filed a declaratory judgment and sued Atlantic Trust. Instead, he did neither. He negotiated the release of those claims, which allowed him to enter into a competing business. Then for two years, he abided by it until the provisions expired and stopped payment. Basically, he received no further benefit from the agreement to which he entered into. And I would analogize this to a situation where if an employer entered into a release agreement with an employee that waived Title VII claims in exchange for two years of severance paid out over time, and then as soon as the statute of limitations ran on the Title VII claims to stop payment and claim, well, there was no, you had no merit to your claims anyway. That's what I believe the defendants are arguing here. And frankly, I think that misses the point. I think the point is that we avoided, both parties avoided having to enter into litigation over the enforceability of this agreement. And I believe that's what Callis, LeMaster, Wilson, FH, Prince and Company, and talent investors all say is, look, if you are waiving your right to initiate litigation over something, that's sufficient consideration. Even if ultimately had gone through litigation, you may not have won as long as you had a good faith belief. And I believe that there's no question here that we had a good faith belief in the enforceability of the 2002 agreement, that in good faith through extended negotiation that took several months with a defendant and his counsel entered into this release, and then we abided by what we agreed to. We never initiated any of the litigation. And so I believe that the defendant here is trying to turn this into a question of the enforceability of the underlying restrictive covenant, which is not the case. The question is the enforceability of the release that we entered into. And I think it's clear from the facts here, from the cases, we talk about releasing of claims that we've done it. Now, you've stated that it may be a contingency, but the contingency rests in the defendant's hands. It did not rest in our hands. Thank you. Thank you. There's no further questions. Good afternoon. My name is Jerry Rainey. I represent Mr. Graber. May it please the court. It may. Thank you. I'd like to begin, before getting into some of the presentation, just for an example of two scenarios, because the Sunbelt case was raised by counsel, and part of my discussion is going to address that and address the longstanding law in this jurisdiction. Employee A has been in business for a while or worked in a particular area, has a book of clients, he joins a business, and then after a couple of years, he elects to leave because he's not working out. He'd like to go back to the life he had before he started work by servicing those customers that he had before ever starting work as an employer. Employee B did not have any book of business that he brought with him when he joined the employer. He developed his relationships solely by working for the employer and, but for that employment, would never have met those customers. Conceding what you're saying and what you're going to say, that the 2002 agreement was unenforceable. Conceding that. What's your answer to the cases that hold that? Even though the agreement is not enforceable, if you give up your right to sue on that potential agreement, that's a valid consideration. How do you get around those cases? Two points. First of all, none of those cases address a non-competition agreement, which courts view strictly. That's number one. Number two, if that becomes a law in the state, what's to stop an employer from having every single employee sign two agreements? The first one, very onerous. The second one, almost as onerous, but just a little bit different. And then say, yes, this restricts competition, but this employee gave up rights under the first onerous contract. Therefore, the second onerous contract is applicable and should be enforced. Well, Sundell came down long after your case and the most recent Supreme Court case on the topic just came down recently. And at the time we negotiated, the big problem I see with your non-compete agreement is the distance, not the time. And certainly there was enough of, if you take the position that Sundell requires some type of closer relationship between the parties, you still have an agreement that could have been acted upon. And as I understand from plaintiff's counsel's argument, there were other rights in there besides the non-compete clause. Relative to trade secrets, there may not have been trade secrets relative to certain type of customers, but there were other rights other than the non-compete. None of those rights were released, Judge. If you look at the separation agreement, it defines only two paragraphs that are not released. What the separation agreement really is, is it's a modification of the first agreement that puts in a liquidated damage clause. It says, you're not supposed to do X, but if you do, here's what you pay us for. And that's a liquidated damage clause. And so therefore, the analysis on that, I mean, there's a number of grounds, Judge, at the trial court below as to why. And I think that the judge down below had a number of reasons to dismiss this case. Number one, he gave them every opportunity to continue to re-plead, because they never pledged that the clients at issue here were ones that were developed during the employment relationship and that, but for the relationship, my client would never have come in contact with them. That's just not the case. Indeed, the plaintiffs, for some reason, attached my letters that I sent even before the litigation began. You're saying basically that your client entered into an original agreement that basically said that he couldn't solicit clients that he had brought into the firm within a certain distance and time. Well, there's two documents, Judge. First, there was one when he was hired. Yes. When that document was signed, there's nothing in there about, what did the plaintiff obtain in that document? There's nothing of a transfer of my client's clients to them. There's no restriction in there that says, by the way, if this doesn't work out on your leave, you can't touch your clients again. It says that nowhere in the agreement. And the original one when he was hired. The original one said that he would sign a more detailed non-compete agreement in the future. That's true. So both of them had a state of mind that your client knew that when he signed the first agreement, that to keep the job, he had to sign another non-compete agreement that wasn't drafted yet. Which indicated that he would not take any of the plaintiff's clients, and he did not. The only folks that he serviced afterwards, and the only allegation in the complaint is that the customers that he brought with him are the ones that he serviced after his employment. Here's the way I understand the case. It was your client who asked that there be a conference. He was leaving. The plaintiff knew he was leaving. Apparently, they both had a very good relationship at the time. Your client made a lot of money, worked good for the company. The company made a lot of money, treated your client well. When your client decided to leave, approximately three or four weeks before, just say a month, it doesn't matter that much, he asked for a conference so that the employer and he could possibly enter into some agreement that would obviate any potential lawsuits or claims made under the 2002 agreement. That's not part of the record, Judge. I mean, I know it's an allegation that was made that my client asked for a meeting, but there's nothing in the separation agreement that says that that was the deal. The word forbearance is not in there. None of those items are in there. And the notion that there was a release is just not borne out. They kept their rights, all of their rights under the original agreement. They provided a liquidation, liquidated damage provision, which I believe is a penalty because, as counsel said, it's basically one year of all gross revenue. As you pointed out, Judge, there was a salary to be paid. Was it one year gross of his revenues or was it one year gross of all the clients that he allegedly took with him? My point is he could have had additional clients that had no connection with him either before or with the plaintiff. There could have been five other clients. Was your client required to pay commissions or liquidated damages on those as well or only on the ones that he supposedly were clients of the plaintiff's firm? Judge, I believe it was the ones that were listed in that agreement. The ones that were listed in the agreement. And it looks like a long list, but it's actually maybe 18 or so clients because many of them are trusts that have a number of different trusts. So one client might have four trusts, but it's really only one client. But I do want to address that issue because when my client was employed, those gross revenues from those clients would be used to pay his salary, to match the Social Security, to pay for the growth insurance and all the rest. Under this separation agreement, there's no deduction. I know they said they simply wanted to enforce a contract. A contract allows to make you whole, not to provide you with a windfall. There's absolutely nothing in here that would give them the net, the costs to my client of obtaining those, servicing those, paying for employees, rent. That's something that would be borne, but he'd have to give everything over. That's really a penalty. He only worked there really for two and a half years after the signature of the non-compete agreement, and this is a one-year gross revenue provision. Are you saying that this is liquidated damages in part because the amount of damages that they would realize had he taken the clients would have been the profits or the net profits that they would be entitled to based upon a breach of the original agreement? Whereas under this agreement, they get 100%. Absolutely, Judge. That's why we also argue a penalty down below, because that's Hadley v. Baxendale. One of the first cases you'll learn in first-year law school. Savings to the plaintiff have to be taken out of any calculation on a breach of contract damage. You don't get the entire amount of the contract. Whatever savings there is to you has to be deducted out of that. What this agreement provides is for the whole thing without using the Hadley v. Baxendale formula, which has obviously been used since… Who directed that agreement? I think the agreement was directed by the plaintiff. By who? By the plaintiffs, by the employer. And what role did the defendant's attorneys, the Craig's case, play? Judge, I honestly don't know. I was not engaged by Mr. Graver until sometime in maybe the fall of 2007 or summer of 2007. I'm not sure. He was certainly happy with the contract for the two-year period that the 2002 restriction was alive because he paid. And so until that agreement… I don't know, Judge. I didn't really know him during that time period. Well, let's not speak about that. He was under the 205-206 agreement. He made payments up until March of, I think, whatever it was. I don't think it's part of the record, Judge, but I do want to answer your question. I don't think he was happy with anything. That's why he hired me and he asked me to take a look at it. And what I said is I don't think this is enforceable, and that's what I told the plaintiffs in my letters, that are attached and part of the record. I do want to mention before I run out of time, I do think we need to talk just a little bit about a couple of cases and about this Court's longstanding view that you have to have a technical interest. And I know that Sunbelt was rather harsh on a number of appellate courts, including this one, in the Hansen paper decision, which the 4th District called a 3rd District opinion, but it's actually a 2nd District opinion. And in that one, in Sunbelt, the Court said that this legitimate business interest test was out of whole cloth. I don't really think that's an accurate view. Well, I've held on to a pants for about 30 days here in this city. Two more cases coming out of the 2nd District on this exact topic. How it's going to come out, I don't know. Well, I'd like to weigh in at least a little bit as to whether or not the Supreme Court said anything, because the Cockrell decision, which was in Sunbelt, actually says, and this is a quote, in determining the reasonableness of the restriction, the injurious effect thereof upon the general public must be considered, as well as any hardship on the promissor, and the need for the protection of a limitation by the promisee. It says, the House of Visions Supreme Court case that says, the protection of this asset, meaning the client, is recognized as a legitimate interest of an employer. I think that that's important. The hypothetical I was beginning with was, if you have two situations, one in which there's an employer who had a book of business came with him, the relationship's not working out. He wants to leave. And he leaves and just says, I'd like to go back to my old wife. There shouldn't be a restriction placed on him. The second point, and this Court has placed restrictions on the second circumstance, where but for the employment, the employee would never have those clients and to have that opportunity to service them, this Court has found certain restrictions to be reasonable and has done that. That makes sense. That's a rule of reason. Because if all you're going to do is look at time, and all you're going to do is look at geographic scope, how can you distinguish the fact that I gave you with those two employees, employee A and employee B? You couldn't distinguish them because you'd have to go, I guess my point is, reasonable compared to what? The time limitation is reasonably based on what? It should be the nature of the business and also the nature of the interest that's deemed to be protected. Here, this is, and I know they said it's really not a restriction on competition. It is. Whether you stop somebody from working by giving them the Heisman, where you put your hand in your pocket for going out and servicing clients that they had before they ever met you, that's restriction on competition, and that's not allowed. Let's assume that 2200 restrictive employment agreement was not valid. Is it your position that we should, because it is an employment restrictive type of contract, treat this case differently than another contract case which doesn't have a restrictive covenant in it, but is probably unenforceable on its face by just reading it? Judge, I think that, and I say that based on case law that's out there. The Brown decision is one of them, for example. It talks about the fact that adequate consideration and looking into the accuracy of the consideration is required. It's not simply the peppercorn theory as Professor Corbin analyzed years ago. You have to look at it because it is a restriction on competition. In this case, it's more than a restriction on competition. Your client brought these people into the firm. It is. It's basically you walk into the firm and you're stripped of your value just simply by saying it. And it didn't say that anywhere in the papers. By the way, folk, you used to be sourced, but now you're handling. I'm sorry? You used to be sourced, but now you're handling. Those are terms used in the legal practice of law, whereas if you are the source for the client, you get some perks or some additional consideration. Whereas if you handle the client, you don't necessarily get the same perks or benefits that the source does. We call it origination versus income. Okay. Same concept, I understand it. We're worlds apart. Cook and DuPage, that is. Yeah. So, I mean, that's really the problem here because, I mean, I think that the rules are set up. In fact, I looked at the cases from this district, and, you know, that test is, I don't think it's a pro-employer test, the legitimate business test, or a pro-employee test. It's a pro-reason test. It's reasonable. In many of the cases that made it to this district court, the restrictions have been found reasonable when that business interest test has been met. Thank you. Any other questions? Thank you, sir. Mr. Wunderson. Thank you, Your Honor. I believe that defendant's counsel's argument just essentially, again, I think erroneously focuses on the enforceability of the underlying 2002 agreement. Instead, we are not seeking, this lawsuit was not intended to or it was not filed to enforce the 2002 agreement. We are seeking to enforce the 2005 agreement, which is not a restrictive covenant. But he's arguing that the 2002 agreement was void and, therefore, you could not shape, mold it into consideration, legal consideration. But the cases state that if you were releasing a claim, it doesn't matter ultimately if the claim being waived is valid or invalid. All that matters is that there has to be a good faith belief in the enforceability of that. It's stated in the record, in the documents, that Mr. Graver was not brought on simply as an employee. He was brought on as a highly compensated employee. He was given equity and the parent company of Atlantic Trust, which on its option value was worth approximately $160,000 to $200,000. There's no question that those were things that were received. In exchange, he agreed not to compete. Now, had Mr. Graver believed that this was an unenforceable agreement, that these restrictions were unenforceable, he was not obligated to have counsel enter into an agreement to release this. The term agreed not to compete, what does that mean to you? Does that mean that he agrees not to be in the area of service or manufacturing or production that you are? Or does it mean that he is not going to compete in a way which anybody else in the industry wouldn't be allowed to compete? In other words, he is, at least based upon the nonrestraint of free trade, he's given the right to do everything else that some third party would do who supposedly didn't have any connection to your client. Your Honor, the definition of compete is set out in the agreement itself, but it is admittedly a broad definition of compete. It's for a two-year period of time, and I believe that the question of the enforceability of that agreement isn't the point here. My point is that when you said what you said, what conjured up in my mind was a contract between an athlete and a team. And it indicated that he would agree not to compete. He would retire for two years. He would not join any other team. He wouldn't even go to Japan and play the sport or some third country. He would cease doing things that he was doing for you. And I don't think that is the law. And that's what it sounds like. You're sugarcoating the pill to the extent that you're saying that he got good compensation, he got equity, and so on and so forth. But what you say when you say he's not supposed to compete, you're saying he's not supposed to deal with people that he had been dealing with previous to coming to your employment. And if you want to look at it as the purchase of a company, I mean, essentially what Atlantic Trust did was purchase Mr. Graber's book of business in exchange for equity in the company. He was given equity in the company in exchange. They brought him in, paid him a hefty salary, and he brought the clients. That was all part of the deal. So you're saying the defendant gave up his exclusive interest in his book of clients when he accepted the employment agreement. Is that the gist of it? I would think that that's a reasonable interpretation of the transaction. And so, therefore, based on your analysis, the terms have changed. And so when he wants to leave now, there is valid consideration because that contract, the O2 agreement has now become enforceable because in return for his bringing the book of clients, that's what you both called it, he's received equity and a very lucrative salary for the two and a half years. Is that good? Yes, Your Honor. But, again, I don't think the issue is ultimately the enforceability of the underlying agreement. Had Mr. Graber believed that that agreement was unenforceable, to use your analogy of the athlete, the athlete then could have gone, could have filed this lawsuit and had then declared unenforceable or simply gone and competed and waited for the other side to file a litigation. Instead, what Mr. Graber did was say, look, instead of fighting over the enforceability of this agreement, I'm going to agree to pay you a certain amount of money. And I disagree that it's a street tax. I think it's more properly characterized as a payment plan that instead of litigating over this where if I lose and it's enforced, I'm out of work for two years. Rather than face that risk, I am going to negotiate a certain payment plan that I can enter so that I can go ahead and compete with the company and not have to run the risk of whether this agreement is enforceable or not. And now, two years later, it's under what's not coincidentally the provisions have expired. He's going back and saying, look, I made a bad deal. I want this voided because the agreement that the Atlantic Trust agreed not to initiate litigation on is not enforceable as it relates to me. And that's exactly what the case is about the freedom of contract. He had the freedom to contract this away, and we don't believe that the court should find that he's able two years down the road to decide, well, maybe I should have challenged it now that there's no risk to finding it to be enforceable. Any other questions? Thank you very much. Thank you.